Pages 1 - 34

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE RICHARD SEEBORG

```
MEDIOSTREAM, INC.,              )
                                )
            Plaintiff,          )
                                )
  VS.                           ) NO. C 11-2525 RS
                                )
MICROSOFT CORPORATION, et al,   )
                                )San Francisco, California
            Defendants.         )  Thursday
                                )  September 1, 2011
_____)  10:00 a.m.
```

**<u>TRANSCRIPT OF PROCEEDINGS</u>**

<u>**APPEARANCES**</u>:

**For Plaintiff:**           **BYRON COOPER, ESQ.**
                             530 Lytton Avenue
                             Suite 200
                             Palo Alto, California 94302


                             Capshaw DeRieux, LLP
                             114 E. Commerce Avenue
                             Gladewater, Texas 75646
                  **BY:  JOHN LORD, ESQ.**


**For Defendant**            Covington & Burling
**Microsoft:**               One Front Street
                             35th Floor
                             San Francisco, California 94111
                  **BY:  SCOTT SCHRADER, ESQ.**
                      **ROBERT WILLIAMS, ESQ.**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                 *Official Reporter - US District Court*
                 *Computerized Transcription By Eclipse*

1    **APPEARANCES:   (CONTINUED)**

2

3    **For Defendant**              Covington & Burling
     **Microsoft:**                 1201 Pennsylvania Avenue, N.W.
4                                   Washington, D.C.  20004
                          BY:  **GEORGE PAPPAS, ESQ.**
5                              **RICHARD RAINEY, ESQ.**

6

7    **For Defendant**              Milbank, Tweed, Hadley & McCloy LLP
     **Apple Computer:**            601 South Figueroa Street
8                                   30th Floor
                                    Los Angeles, California 90017
9                         BY:  **MARK SCARSI, ESQ.**

10

11   **For Defendant**              Kenyon & Kenyon, LLP
     **Sony Corp.**                 One Broadway
12                                  New York, New York 10004
                          BY:  **LEWIS POPOVSKI, ESQ.**

13

14

15   **For Defendant**              Turner Boyd, LLP
     **Asus Computer:**             2570 W. El Camino Real
16                                  Suite 380
                                    Mountain View, California 94040
17                        BY:  **JOSHUA MASUR, ESQ.**

18

19   **For Defendant**              K&L Gates
     **ACER America Corp.:**        Four Embarcadero Center
20                                  Suite 1200
                                    San Francisco, California 94111
21                        BY:  **HOLLY HOGAN, ESQ.**

22

23

24            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

25

1  **APPEARANCES:   (CONTINUED)**

2

3  **For Defendant**              Baker Botts, LLP
   **Dell, Inc.**                 910 Louisiana Street
4                                 Houston, Texas 77002
                            BY:  **ROGER FULGHUM**
5

6
   **For Defendant**              Farella, Braun & Martel LLP
7  **Sonic Solutions:**           235 Montgomery Street
                                  17th Floor
8                                 San Francisco, California 94104
                            BY:  **RODERICK THOMPSON, ESQ.**
9

10

11 **ALSO PRESENT:**              Richard Lytle, Esq.
                                  Microsoft Corporation
12

13                                Dr. Cheng Kao
                                  MedioStream, Inc.
14                                   —   —   —   —

15

16

17

18

19

20

21

22

23

24

25

1          **P R O C E E D I N G S**

2  **SEPTEMBER 1, 2011**                                        **10:06 a.m.**

3

4          **THE CLERK:**  Calling C11-2525 MedioStream,

5  Inc. versus Microsoft Corporation, et al.

6          **THE COURT:**  This is quite a contingent for a case

7  management conference.  You can stay in place as you make your

8  appearances, but speak up.

9          **MR. COOPER:**  Good morning, your Honor.  Brian Cooper,

10  for plaintiff.  I have here with me John Lord, who is with the

11  Capshaw firm, and MedioStream's president Dr. Cheng Kao.

12          **THE COURT:**  Good morning.

13          **MR. SCHRADER:**  Good morning, your Honor.  Scott

14  Schrader from Covington and Burling for Microsoft.  With me is

15  lead counsel, Mr. George Pappas, from our D.C. office who has

16  been admitted pro hac vice.  We also have Richard Rainey, also

17  from our D.C. office in the back, who has also been admitted

18  pro hac.  And Rob Williams, he's also from our San Francisco

19  office.  And, also, Mr. Robert Lytle, who is in-house counsel

20  with Microsoft.

21          **MR. SCARSI:**  Good morning, your Honor.  Mark Scarsi

22  from Milbank, Tweed on behalf of Apple.

23          **MR. POPOVSKI:**  Good morning, your Honor.  Louis

24  Popovski, Kenyon and Kenyon, representing the Sony defendants.

25          **MR. MASUR:**  Good morning, your Honor.  Joshua Masur

1    Turner and Boyd, for Asus Computer International.

2              **MS. HOGAN:**  Good morning, your Honor.  Holly Hogan

3    from K&L Gates representing Acer America and Gateway.

4              **MR. FULGHUM:**  Good morning, your Honor.  Roger

5    Fulghum from Baker Botts representing Dell, Inc.

6              **MR. THOMPSON:**  Your Honor, one more.  Sorry.  Rod

7    Thompson representing Sonic Solutions, LLC.  Good morning, your

8    Honor.

9              **THE COURT:**  Good morning.

10             There are two things on the agenda today, first of

11   which is the pending motion regarding, as I understand it, the

12   source code, Apple's source code and where it may go.  And then

13   we have the case management conference.

14             Let's start with the motion.  Let me also tell you,

15   just as a matter of general practice -- please make yourself

16   comfortable -- I will certainly address that motion today.

17             To the extent that there are ongoing discovery

18   motions, and I suspect that there will be, my practice,

19   consistent with most of my colleagues, is that will be referred

20   to a magistrate judge.  So I will not be doing the discovery

21   motion practice.  But as I say, this one I will address today.

22             I know these cases come to me with some history in

23   Texas.  So I have gotten the background.  You know that I had

24   issued an earlier order in this case when it was first assigned

25   to me regarding a stay request and the like, so I have some --

1  some understanding of where things stand.

2          But let's start with the -- as I understand it, the

3  motion, which is a motion for a protective order brought by

4  Apple with respect to the source code that up to this point has

5  been domiciled, if you will, on computers located at the

6  Goodwin Procter firm, that I understand now is seeking to

7  depart the scene.  And so what we do with respect to the

8  housing of the source code, seems to be the question.  Is that

9  the motion that's pending?

10          MR. SCARSI:  That's correct, your Honor, yes.

11          THE COURT:  Who is going to address the question?

12          MR. SCARSI:  I do, your Honor.

13          THE COURT:  And, also, from the plaintiff's side, who

14  MedioStream's side, who wants to address it?

15          So where do things stand?

16          MR. SCARSI:  Well, to start off, your Honor, the

17  protective order in this case is unlike protective orders in

18  most other cases where software is at issue.  Most cases allow

19  a party producing software to make it available for inspection

20  under their custody and control.  In fact, that's the standard

21  order in the Northern District of State of California and, in

22  fact, after Judge Everingham entered our protective order, the

23  Eastern District adopted a standard order just like the

24  Northern District of California.

25          So the Eastern District's current standing order

1  requires the producing party to make it available under their

2  own control.  So our protective order is completely opposite of

3  what's done in every other case.

4       Why did that happen?  At the beginning of the case

5  the plaintiff argued that they needed 24-hour access to the

6  software because they had so many defendants, so many products,

7  they were never going to be able to put together their

8  infringement contentions if they didn't have 24-hour access.

9  We offered to give them extended hours, made a number of

10 concessions, but ultimately the judge ruled against us.

11      Since that time Apple has provided MedioStream with

12 six separate source code computers, each one having various

13 versions of source code on it and they have been housed at

14 Goodwin Procter's office in the Silicon Valley.  We have --

15 over that time, over the couple years where the software has

16 been there, we have helped to maintain it.  So if there is

17 issues with the source code, they needed something else, there

18 were problems with the machines, they needed help finding

19 something, we would send somebody down there usually the same

20 day, and we made probably a couple dozen trips down there to

21 help maintain the source code.

22      So now Goodwin wants to withdraw from the case, and

23 what MedioStream has asked is that the source code computers be

24 shipped to Susman Godfrey in their Houston office, and to us it

25 doesn't make sense for a couple reasons.

1          One, the big rush is over.  The 24-hour access no
2     longer seems necessary.  It also seems that now is an
3     appropriate time to sort of write our protective order, to get
4     it in line with every other protective order.
5          And it also seems to us, from a logistics standpoint,
6     it would be much more difficult for us to provide the support
7     we've provided if we had to send somebody to Houston in order
8     to fix something or to download new software.
9          Plus MedioStream's lead counsel is -- was resident in
10    the Silicon Valley area.  We are not dealing with lead counsel
11    that is out of the jurisdiction.  Everybody is in the Silicon
12    Valley area, your Honor, that's why the case ended up here.  It
13    makes no sense to send everything to Houston.
14         The Susman lawyers, I'm not sure what their
15    involvement will be in the case, but certainly we've gotten
16    past the big crunch of infringement contentions.  We're now at
17    a point where it does make sense to re-look at the protective
18    order.
19         And to us it just seems from a logistics standpoint
20    moving the software from here, Silicon Valley area where we can
21    help maintain it, to Houston just seems, one, not very secure
22    and; two, doesn't make a lot of sense from a logistics
23    standpoint.
24         **THE COURT:**  Okay.
25         **MR. COOPER:**  I will try to be brief here, your Honor.

```
1              The protective order covers all this.  It requires
2      that the source code be produced to counsel for the other side
3      for safekeeping in their office.  MedioStream has produced its
4      source code to counsel all over the country.  Sony, for,
5      example has produced its source code to MedioStream's counsel
6      both in their New York office and in their office here.
7              The only party that is now making an objection to
8      that is Apple.  And we believe that as long as Goodwin
9      withdraws, it should go to MedioStream's counsel's office,
10     wherever that is.   Apple does not have the right to choose
11     where our counsel lives.
12             THE COURT:  But you have local counsel.  You have to.
13     You're here.
14             MR. COOPER:  That's right, your Honor.
15             THE COURT:  Why can't it stay in the Northern
16     District of California?
17             MR. COOPER:  Well, your Honor, I would be perfectly
18     willing to take care of the code here as well.  And if the code
19     has to stay within this district, I can provide a place for
20     that for safekeeping.
21             THE COURT:  I don't see -- I mean, to some extent
22     geography is of less consequence than it used to be in terms of
23     these issues, but I don't see why it should -- it's not so much
24     that it must stay here.  I don't see why it should go to
25     Houston.  It doesn't make any sense to me why you would -- the
```

1   issue of whether or not the protective order that was entered

2   in the -- by the Court in Texas is somehow out you of sync with

3   the standard approach in the Northern District.  I tend to

4   agree with you that the way, in my experience, it operates is

5   consistent with what you said.  We don't have any standard --

6   we have template protective orders which provide guidance to

7   counsel.  We don't have a standing order, if you will, that

8   source code can be treated in a particular fashion.

9          So I don't think I go quite as far as you are

10  suggesting maybe is the case.  I think you're right that in the

11  past I have operated consistent with the way Apple is

12  suggesting we operate.

13         However, the protective order is what it is.  It's in

14  place.  I am somewhat disinclined to revisit it and start from

15  scratch.  But I'm also disinclined to send the source code out

16  of this district because I don't see any reason why we should

17  do it.

18         So, my reaction is it should -- if Goodwin Procter is

19  departing the scene -- and I know I haven't signed off, but I

20  will, to allow them to depart -- I would think that it should

21  go to counsel within the district representing plaintiff and

22  then you can work out the logistics at that point in time.  I

23  mean, that's my inclination.

24         **MR. SCARSI:**  And the only issue we have with that,

25  your Honor, is we would like it to be -- we, obviously, didn't

```
1   want it to go to plaintiff's -- to counsel of record in the

2   underlying case.  It went to Goodwin Procter.  Goodwin Procter

3   was in sort of a big office building, 24-hour security, all of

4   those things.  We would like to make sure that if it stays

5   in -- if it goes somewhere else, that, again, it's in a secure

6   building with all of the sort of -- secure building with

7   24-hour security, all those sorts of things that Goodwin

8   Procter.

9           THE COURT:  Which of the offices -- you're

10  Mr. Cooper?

11          MR. COOPER:  That's correct, your Honor.

12          THE COURT:  Mr. Cooper, counsel who will be

13  representing MedioStream in this district, is it -- are you the

14  representative or are there additional counsel that have

15  offices in this district?

16          MR. COOPER:  I am the counsel, your Honor, and I will

17  have to arrange for space either within Goodwin or somewhere

18  else.  So that, in fact, what will likely happen is that the

19  computers will be maintained at Goodwin and I will arrange

20  something with Goodwin so they are kept in the same manner that

21  they are currently kept in.

22          THE COURT:  They won't move.  They will stay right

23  where they are?

24          MR. COOPER:  That is right, your Honor.

25          THE COURT:  Goodwin Procter just won't be counsel any
```

1  more.

2          Do you have any problem with that?

3          **MR. SCARSI:**  Obviously, we would like to move them to

4  our own counsel's offices, but if your Honor is inclined to

5  have them stay there, that's fine.

6          And I just want to represent to the Court and to

7  Mr. Cooper, Apple has got relationships with lots of law firms

8  in the Silicon Valley area and Apple is perfectly willing to

9  put it in a law firm at its own cost that's convenient to

10  Mr. Cooper.  So he doesn't even need to go to the expense of

11  paying Goodwin Procter to maintain it there.  We could put it

12  in a number of different counsel's offices.  We can offer him

13  access during normal business hours even --

14          **THE COURT:**  You know, this issue seems to me to be

15  one that shouldn't be -- counsel shouldn't be spending a lot of

16  time discussing.  I mean, there is no tactical or strategic

17  advantage, particularly in light of my decision it stays within

18  the district.

19          I think we ought to do what's the most convenient,

20  addressing security concerns, but is the most convenient for

21  both sides.  And I will expect you to operate professionally

22  and provide access and the like.  And, you know, where these

23  particular computers are located seems to me to be an issue

24  that we don't want to spend a whole lot of time on.

25          So I think you ought to meet-and-confer and if there

1   is another spot that is just as good and you don't have to pay

2   rent or whatever, why don't you just work it out?  It's not

3   worth a lot of fighting.

4           MR. COOPER:  Agreed, your Honor.

5           THE COURT:  The issue was whether or not I would let

6   it go to Houston, and I won't.  So once that's done, I think

7   you guys ought to just kind of work it out.

8           MR. SCARSI:  Thank you very much, your Honor.

9           MR. COOPER:  Thank you, your Honor.

10          THE COURT:  Okay.  Now, with respect to the case

11  management conference, you know, I'm aware that we -- what I

12  have in front of me, as I understand it, is that there are

13  three related cases that are now assigned to me, and in two of

14  those three there's a stipulated stay, as I understand it; is

15  that correct?

16          MR. COOPER:  That's correct, your Honor.

17          THE COURT:  So we're talking about the third case, if

18  you will, which I guess is the earliest case; is that also

19  correct?

20          MR. COOPER:  That's correct, your Honor.

21          MR. SCHRADER:  That's correct, your Honor.

22          THE COURT:  And that had gotten a long way along the

23  path in the Eastern District of Texas, and then there was the

24  litigation up the line and off it -- off it gets sent to me.

25          I guess my question is:  Could you highlight for

```
 1  me -- I did go through your statement, the statement, but
 2  highlight where the dispute is with an understanding that, as
 3  you all are aware, my calendar is such that you're looking at
 4  the earliest late 2012 to begin with.
 5          So with that understanding where -- where is the
 6  points of contention in terms of scheduling and the like?  I
 7  understand that the defendants are saying you should stay the
 8  whole thing pending the determination on this, the appeal of
 9  the PTO's reexamination efforts.  And the plaintiffs are saying
10  no, you should schedule now.
11          I guess I'm not quite clear on what -- if I --
12  whichever path I take at the end of the day, it's going to make
13  that much difference.  I suppose in terms of whether or not
14  discovery can continue, it would have some consequence, but my
15  understanding was mostly that discovery has been completed.  So
16  I guess I'm not clear on what consequence will flow from going
17  one way or the other way in this instance.
18          So why don't we start with you, Mr. Cooper?  And then
19  we will go to you.
20      MR. COOPER:  Very well.  Thank you, your Honor.
21  Thank you for the order, your Honor.
22          I realize that this Court is very busy and we would
23  like to set a schedule that places the least burden on this
24  Court.  MedioStream is prepared to offer to stay this case, if
25  all the defendants will stipulate to be bound by what happens
```

1    in the *Inter Partes* proceedings.  Right now we only have one

2    party, Apple, who is in that proceeding.  It is proceeding on

3    one prior art reference.  All the other defendants are claiming

4    they then have the right to file other *Inter Partes*

5    proceedings.  If they are willing to be bound by the outcome,

6    then we can have no burden on this Court.  We will stipulate to

7    stay this pending the final outcome.

8            **THE COURT:**  Well, but the notion that other parties

9    may weigh into the fray, that -- it isn't automatic in my mind

10   that even if the action vis-a-vis Apple is stayed, that I would

11   automatically say, "Oh, another party brings some proceeding in

12   the PTO.  You get an automatic stay."

13           I mean, so the concern that you're expressing, I

14   don't know if that concern flows from what you think would

15   happen if there was a stay vis-a-vis Apple.  I mean, my

16   understanding is that Apple is fairly far along in this case,

17   and the PTO has rendered its determination on reexamination,

18   and the question is now the appellate process.

19           But that pertains to Apple.  And so if another

20   defendant seeks reexam or some other proceeding in the PTO, it

21   wouldn't automatically follow that everything would be stayed

22   pending the conclusion of that activity.

23           **MR. COOPER:**  Right, your Honor.  Essentially what I

24   would -- what MedioStream would like is that if we're going to

25   stay the proceeding pending what happens in the *Inter Partes*

1  reexam, that all the parties be bound --

2          **THE COURT:**  Why do you need a commitment from them?

3  In other words, is the commitment that you're seeking so

4  that -- so that once the litigation with respect to Apple's

5  reexamination process is concluded, you don't face further

6  stays?  Or what is it -- why are you asking everybody else to

7  be bound?

8          **MR. COOPER:**  To make sure, your Honor, that it's

9  clear that all the parties are bound.  Therefore, they have no

10  right during that process, or afterwards, to file their own

11  *Inter Partes* proceedings.  And when those proceedings --

12          **THE COURT:**  I see what you're saying.

13          **MR. COOPER:**  When those proceedings are done, we're

14  not still litigating the same issues by other parties.  So that

15  it's clear that this Court was not burdened.  We proceeded in

16  the Patent Office and what happened in the Patent Office is

17  final as to all the parties.

18          **THE COURT:**  Well --

19          **MR. PAPPAS:**  George Pappas on behalf of Microsoft,

20  your Honor.

21          I'm addressing the global issues on the schedule.

22  And any questions you have, counsel for the other parties are

23  here to address issues as they come up.

24          Your Honor, simply put, I don't think -- certainly,

25  as to Microsoft.  We're not in a position to agree to be bound

1  by what happens in the Apple reexam.  Your Honor is quite

2  correct that the only *Inter Partes* reexamination pending at

3  this time is one that was filed by Apple largely, and almost

4  exclusively, placed on some cleaner prior art, that's the name

5  of the product there was material on.  And there's other prior

6  art out there.

7           So I think, your Honor, what -- we understand your

8  Honor's ruling on our motion to stay was without prejudice, but

9  I think our purpose in being here today, and all of my

10 co-defense counsel, is that we think that the position of this

11 case before the Patent Office is such that the best useful

12 judicial resources is to, in effect, do a stay and to give the

13 board time to rule.

14           **THE COURT:**  And that, though, gets to my earlier

15 question about my own schedule.  I guess I'm not necessarily

16 seeing the difference between my scheduling a late 2012 or

17 early 2013 trial and a stay, unless it's that the discovery and

18 the like is the one consequence.

19           Otherwise, it's really the same thing because from

20 your calculation, at least the ones that I read -- the one I

21 read in the joint statement is your expectation is if all goes

22 well, you will have a determination before the trial date.

23           **MR. PAPPAS:**  That's correct, your Honor.

24           **THE COURT:**  So to some extent -- you know, the danger

25 of not setting a trial date is you fall further and further

1  behind.  It's the reality of life here.  And that may not

2  trouble you, but it will trouble the plaintiffs.

3            So, and your concern as to why everything should be

4  stayed is to allow the re-examination process to play itself

5  out.  And we may be able to accommodate both of those by

6  setting a trial date in early 2013.

7            **MR. PAPPAS:**  Your Honor, I think -- if I can address

8  that, I think we can -- may I hand something up your Honor that

9  I think summarizes what was in our statistics?

10           **THE COURT:**  Sure.

11           **MR. PAPPAS:**  I have given one to the other side.  May

12 I give would be to your law clerk as well, your Honor?

13           **THE COURT:**  Sure.

14           (Whereupon, document was tendered

15            to the Court.)

16           **MR. PAPPAS:**  Your Honor, what we've done in response

17 to your order -- and I think this exhibit will help frame the

18 issues and answer your question -- is your Honor asked us to

19 discuss what remains to be done in the case and, also, to give

20 our best estimates as to when a decision will be done.

21           **THE COURT:**  Which I realize is reading the tea leaves

22 to some extent.  I have been in this business long enough to

23 know an estimate is an estimate, and who knows.

24           **MR. PAPPAS:**  I understand, your Honor, but I think

25 what we've done is in response to your order, Mr. Zapf, my

1  colleague, spent about two-and-a-half days combing through

2  actual data and statistics from the board to try to give your

3  Honor some assistance so that we're doing more than speculating

4  and making an educated assumption.

5          And what we show on this exhibit is you have the

6  right of appeal notice on the '655 patent that was February 14,

7  2011, and the right of appeal notice on the '172 patent that

8  was January 28, 2011.

9          Now, those dates are important, your Honor, to ground

10 us because that tells you, in effect, when the Patent

11 Examination Office declared their action final and issued an

12 appeal notice.  So now MedioStream is on its way to the Board

13 of Patent Appeals and Interferences.

14         One thing I think to appreciate, very briefly --

15 although if there's any questions in depth about the reexam,

16 Mr. Scarsi can handle them -- is these patents that are before

17 you, '172 and the '655, have been examined now three times by

18 three examiners and found invalid.

19         Now, what we then looked at was, first, Mr. Zapf

20 looked at, well, what's the median time?  So we took the year

21 period from August 2010 to August 2011, right before we filed

22 with your Honor, to get the most recent data and the

23 methodology set forth in Mr. Zapf's affidavit.

24         All right.  Let me just come to the conclusions,

25 which I think help.  What we found was the median time to a

1   board decision that took place in this one-year period was 18.2

2   months, which means -- again, "median" means some moved faster,

3   some moved slower; but nevertheless we would expect a decision

4   from the board by August of 2012.

5         Now, we didn't want to just stop there because as

6   statistics and numbers are, we think it helps to look at the

7   data in a different way.  So Mr. Zapf, in consultation with me,

8   said:  Well can we give the judge some indication of when a

9   substantial portion of the reexamination appeals are decided by

10  the board?  So 75 percent was chosen.  That's an assumption by

11  us, but we thought it was a fair assumption because it tells

12  you when we can expect three out of the four cases to be

13  decided by the board.  What we found is, again during that

14  one-year period from August 2010 to August 2011, is that

15  75 percent of the board decisions were rendered in a 23-month

16  period, which would bring us to January of 2013.

17        That leads us, your Honor, therefore, to our

18  statement in the CMC that if your Honor is inclined not to stay

19  the case, which is the source of our original motion, that a

20  trial date be chosen in the March 2013 time period and our

21  schedule works back from there.

22        Now, but there is something else I'd like to address

23  that I think balances the parties' interests, which is that in

24  that interim period, at least up until next July when we

25  propose a case management statement, that your Honor would

1   actually enter what would be called a stay for that period of

2   time.

3           Your Honor may ask, What's the difference,

4   Mr. Pappas, whether I call it a stay or I just embody the

5   scheduling that you have proposed, that the defendants have

6   proposed into an order?  And the answer, your Honor, is found

7   in -- we believe in the manual *Patent Examining Procedure*,

8   which we cover on Page 11, which basically says in a nutshell

9   that if we are able to present a stay for any period of time to

10  the Patent Office, particularly in the current status of

11  appeal, that they will take up our case with all dispatch.

12          Simply put, your Honor, working through this maze of

13  regulations, we think that a stay by your Honor for some period

14  of time, even if it's just till July of 2012, would allow us to

15  encourage the Patent Office to act pursuant to their rules with

16  dispatch, thereby giving us a high likelihood -- or a higher

17  likelihood that we would have a decision by that time.

18          And so, your Honor, that is the reason for our

19  proposal.  And we could then set a status conference with you

20  for July 2012, as we proposed, and at that time the remaining

21  discovery and other proceedings could be completed.

22          Now, let me address, your Honor, if I may, why we

23  disagree with the plaintiff's proposition insofar as their

24  schedule.  Their schedule basically that they have proposed

25  would have a very substantial amount of work done between now

1  and July -- excuse me, February of 2012 and then there would be

2  about a six or seven-month hiatus until their proposed

3  October 2012 trial date.  What that really amounts to, your

4  Honor, is a request to start these proceedings, which have

5  already been enormously expensive for all parties, then stop

6  and then start again.

7         THE COURT:  How much is left to do?  I mean, remind

8  me of the point you had reached in Texas.  Is there -- did

9  discovery close?

10        MR. PAPPAS:  Your Honor, I can tell you briefly what

11  remains to be done.  There are the six outstanding motions that

12  are on Page 6.  And there is -- the parties agree that there

13  is -- rebuttal expert reports need to be served, and then

14  dispositive motions need to take place, and then other pretrial

15  procedures that are set forth on Page 8, your Honor.  These are

16  further pretrial proceedings numbers one through seven.  These

17  are ones on which all parties agree.

18         I do want to address, though, that at least as to

19  Microsoft, your Honor, there is some remaining fact discovery

20  to be done, but I want to stress --

21        THE COURT:  But that would be by leave of Court

22  because the time has run.

23        MR. PAPPAS:  It would be by leave of Court, your

24  Honor.

25        THE COURT:  Obviously, if you would prevail on some

1    of these pending motions -- some of them are discovery motions,

2    so those would result in additional discovery should whichever

3    side is seeking the discovery prevails.

4            **MR. PAPPAS:**  Exactly, your Honor.  But I do want to

5    give you the flavor of those though.

6            First of all, the limited fact discovery, and most of

7    them -- most of the discovery we were talking about, limited as

8    it is, arise out of the following general statement of facts.

9    October 15, 2010 was the close of fact discovery in the case in

10   Texas and thereafter we got allegations of new products

11   infringed.  The allegations it made earlier, but they were

12   allowed in by Judge Everingham on October 18, three days after

13   the close of fact discovery.  So at that time we found that

14   Microsoft's products in server operating systems, as yet

15   unnamed, although there are many, they would involve Movie

16   Maker and DVD Maker, were then added to the case.  So that was

17   three days after.

18           Four days later we get an expert report from a

19   Dr. Foley, and for the first time, for the first time

20   MedioStream alleges that DirectX, which is a form of code,

21   along with our software development kits also infringe.

22           So in an essence, our discovery, as I said limited as

23   it is in fact discovery, emanates basically from the

24   proposition that products and allegations as to source code

25   were added to the case after the close of fact discovery or in

1    one case for the first time in an expert report.

2            But, your Honor, that can be addressed, it seems to

3    me, to the magistrate judge to whom decides and it also can be

4    addressed, your Honor, within the terms of our schedule.  But I

5    think -- therefore, I think that if your Honor is not inclined

6    to revisit the stay that you denied without prejudice, which we

7    would ask you to do, we would ask you to adopt the option that

8    we have proposed.  It would balance the interests of the

9    parties.  It would make a spring -- a March 2013 trial date.

10   It would give the parties the benefit of not having to do

11   supplemental expert reports and other remaining fact discovery

12   and to tax the Court with motions that may never be necessary.

13   Not only not necessary --

14           **THE COURT:**  Stay light is what you're saying.

15           **MR. PAPPAS:**  Stay light.

16           The other thing is, your Honor, I think that things

17   may change, and that's what we object to, the plaintiff's

18   proposed schedule.  If a party is doing a lot of work between

19   now and February, there could be, of course, the -- the board's

20   decision could make that all a very unnecessary and costly

21   exercise.

22           Number two, motions and expert reports may have to be

23   revised depending on what happens in the interim.  For example,

24   the *Therasense* case was decided recently en banc by the Federal

25   Circuit.  Well, the reports in virtually a number of patents

```
 1  cases are now being rewritten in what -- on inequitable conduct
 2  in light of that.
 3         The Unilock decision came about on damages after the
 4  plaintiff's expert reports.  Ours aren't done yet, because we
 5  haven't done rebuttal reports.  But that pretty much puts to
 6  rest this idea that you have to show a direct linkage between
 7  the alleged patented improvement and the demand for the
 8  product.
 9         To say that the Federal Circuit is active in these
10  issues might be the understatement of the day.  But it seems to
11  me that unnecessary resource is being expended, both by the
12  Court and the parties, to do that.
13         And then perhaps the last thing I'll say on this
14  point, your Honor, is I would be remiss to my codefendants and
15  my client to not stress this one factor.  As we stand here
16  today, these patents are gone.  They are invalid.
17         THE COURT:  I understand --
18         MR. PAPPAS:  The Patent Office, in effect, said we
19  have made a mistake.  They should never have issued.
20         THE COURT:  I recognize that there has been activity
21  in the PTO and as, you may know from looking at decisions in
22  other cases, I tend not to stay proceedings while I await
23  activity in D.C.
24         But this, in this instance, it's further along than
25  often is the case when that issue is presented to me.  So it is
```

1  a slightly different circumstance.

2          So I'm fully aware of the status of the proceedings

3  in the administrative part of this process.

4          **MR. PAPPAS:**  But what a stay light may do, your

5  Honor, a stay light as you have called it, it may give us some

6  assistance in moving the Patent Office along.

7          And I think we could agree here today, even based on

8  Mr. Cooper's earlier statement about everybody being bound by

9  the Apple re-exam.  I think we could all agree that justice

10  would be served if the schedule works in a way that we get the

11  board's decision.

12          **THE COURT:**  Right.  Although your premise that

13  somehow the speed with which things will occur in Washington

14  will be impacted by whether or not I stay or don't or stay in

15  part or stay for a certain period.

16          I'm not saying that I have any reason -- you would

17  know better than I -- but I'm not aware of the fact that they

18  paid much attention to that, but maybe they do.  I don't know.

19          **MR. PAPPAS:**  Your Honor, I'm just reading their

20  rules.

21          **THE COURT:**  Is it in the rules that if a District

22  Court somewhere stays a pending patent matter where the same

23  patents are at issue, that they will speed things up?  It's

24  interesting.  I didn't know that.

25          **MR. PAPPAS:**  Your Honor, I can only quote to you from

```
 1  the provision that we have in Page 11.  That seems to indicate
 2  to us that they will expedite the matter.
 3          MR. COOPER:  If I may, your Honor?
 4          THE COURT:  Yes, Mr. Cooper.
 5          MR. COOPER:  I took a look at that provision in the
 6  MPEP and that's not what it says.  And I'm not aware of any
 7  such rule either.
 8          THE COURT:  Okay.  Well, why don't you go ahead now.
 9  You have the floor.  Then just give me your input on what you
10  just heard.
11          MR. COOPER:  Your Honor, I could argue against a lot
12  of this stuff.  I won't burden the Court with that.
13              I will note for their statistics though, their
14  statistics relate to decisions, and decisions from the time
15  that the right of appeal letter is sent til the time that there
16  is a decision.  But, your Honor, that only includes about
17  50 percent of the cases because the other 50 percent never get
18  document docketed.  And as a result of that, they are sent back
19  and they are actually prosecuted further.
20              So far an answer has not been served by the PTO.
21  Even after an answer is served, only 50 percent of those cases
22  are actually docketed.  But let me short-circuit that, your
23  Honor, and get to the point of a schedule that won't burden
24  this Court, that will put the least burden on the parties.
25              We will take whatever trial date is most convenient
```

1  for this Court.  What we do need to do, however, is finish

2  expert discovery because the experts are third parties.  These

3  are prominent professors around the county who cleared their

4  schedules for a trial in January of this year and then told a

5  month before that trial that there won't be one.  And now

6  they're waiting for the date --

7          **THE COURT:**  Which I will point out it's not our

8  fault.  This time it's another Court that did that.  I have

9  only had this case since the summer, beginning of the summer --

10  end of spring, I suppose is better.  Go ahead.

11          **MR. COOPER:**  So, your Honor, I would like a schedule

12  that provides those experts some certainty.  The completion of

13  the rebuttal expert reports, their depositions and close of

14  expert discovery for this case.  That gives them some certainty

15  and the setting of a trial date so they can clear their

16  schedule once begin for that trial date so that we're not

17  burdening them with a constantly shifting schedule.

18          **THE COURT:**  I appreciate that and am inclined to be

19  able to accommodate you with that.

20          But the point that Mr. Pappas makes, that for a

21  stand-down period, call it a stay, call it what you will -- I

22  guess in reaction to his comment, if you say get a trial date

23  in the earlier part of 2013, why do you need to do all this

24  before the summer 2012?  I mean, there is a lot of benefit, I

25  would think, to having it closer in time to any trial that may

1    occur.  It may -- how things development, you know, who knows,

2    maybe you won't have to expend all that work one way or

3    another.  Doesn't that make sense?

4          **MR. COOPER:**  Your Honor, what I'm trying to balance

5    here is the burden on the parties with the burden on these

6    experts.  These experts are teaching.  They are doing a lot of

7    other things.

8          **THE CLERK:**  I can give them certainty by saying,

9    "Okay, March 2013 is your trial date."  You calculate, build it

10   into your schedule.  You will have certainty.  But why should

11   they report exchange, the depositions of experts and the like,

12   why should that take place sooner rather than later relating

13   back that you're not going to go to trial until 2013.

14          I mean, it would be a different proposition if there

15   hadn't been anything done in the case, but it looks to me as if

16   it's a fairly -- for a patent case anyway, a fairly limited

17   amount of remaining work that you need to do.  So you have

18   plenty of time to do it from middle 2012, if you have a trial

19   date at the beginning of 2013.  So why rush it, I guess is my

20   question?

21          **MR. COOPER:**  Well, your Honor, it's a matter of

22   finishing the experts' work.  We're halfway throughout that

23   period now.  We're geared up.  They studied everything.  We had

24   tons of meetings, they produced one report that's hundreds of

25   pages.  And we're about to produce the other one and everything

1   just stopped.

2           Now, we're going to have to meet again.  They're

3   going to have to set a schedule.  And what they are asking me

4   is:  We need some certainty.  We need a schedule by which we

5   can do all this.

6           It's fresh in their minds now.  Of course, it's been

7   some months, but now we're going to say what you did instead of

8   completing it eight months after the fact, we're going to do it

9   in another year.  So we're going to have to meet even longer.

10          I realize that --

11  **THE COURT:**  Well, yeah, but you mean the refresher

12  meeting may take a little longer, but the benefit you get, as

13  Mr. Pappas suggested, this is a very dynamic area of practice

14  and there will be all sorts of -- guidance we will get from the

15  Federal Circuit in the meantime, maybe the Supreme Court.

16          It doesn't seem to me with the reality of the trial

17  schedule -- putting aside each side's position on the speed

18  with which they would like to operate, the reality is you're

19  not going to be in trial until -- I mean the earliest would be

20  late 2012, and it seems to me in light of the information that

21  maybe early 2013 makes a bit more than sense.  I don't see any

22  reason why a stand-down period is not in everybody's interest.

23          I was disinclined on the stay out of the box.  I

24  don't like to stay cases for the uncertainties of what may

25  happen in another forum.  But in this instance I have to say I

1   am somewhat inclined towards the notion of some period -- not a

2   stay all the way through until the trial date, but a stay for a

3   blocked period of time, because I don't really see the reason

4   why you should be -- either side should be expending a lot of

5   money.

6           **MR. COOPER:**  And, your Honor, we're willing to adjust

7   the schedule to push everything else back; that is, if we can

8   set a date for which the expert discovery close is so that we

9   can finish the work with those experts and give them some

10  certainty, and then set a trial date, and then as the

11  defendants want to do, we'll have a CMC in the middle of next

12  year.  So between now and the middle of next year this Court

13  would not have to do anything else.  The parties can finish

14  their work with their experts and the experts can be done --

15          **THE COURT:**  This is going back to:  Why do that now?

16  Why expend -- then everything would stop for another six months

17  or so.  The nature of our world here is that then you would

18  have to do some additional material because it's going to get

19  stale.

20          I mean, why not take this hiatus, if you will, and

21  start the process up again in perhaps July of 2012?  It seems

22  to make -- the more I think about it -- sense to me.  And if it

23  has some ancillary benefit of speeding the process along, I --

24  I'm not get to get into -- I don't have to rule on the question

25  of whether or not the board is influenced by a stay or not,

1  fortunately; but if it has that additional salutary benefit of

2  speeding them along, why not?

3        **MR. COOPER:**  Your Honor, I don't think that that's

4  the case.

5        **THE COURT:**  Well --

6        **MR. COOPER:**  What they have cited clearly doesn't

7  state that.  In fact --

8        **THE COURT:**  What I'm saying, my point here -- sorry

9  to interrupt you, but my point here is that whether or not it

10  does, that's not the reason for doing it.  If it has that

11  impact on them in some form or another, the more the better.

12  But the reason to have a stand-down is not to try to prod the

13  board.  It's because it doesn't make any sense to be expending

14  a lot of time, effort and money before you're within the window

15  of when you're going to be going to trial.

16        This is what I'm going to do.  I don't know if

17  anybody else wants to chime in before I way into the fray here.

18        (No response.)

19        I'm going to go ahead and set a trial date, and I

20  will set it in early 2013.  I don't have a particular date in

21  mind, but I will go back and look at my schedule and set a date

22  and I'm hoping that's far enough out so there won't be any

23  problems and you can tell your experts and all that.

24        Then I am inclined to go ahead and have a stand-down

25  period with a commencement again in July of 2012, where it

1  starts up again.  Then I will build in a case management

2  conference probably, oh, September of 2012.  And in the

3  meantime when it can start up again if there are motions that

4  you need to then have addressed, discovery motions or other

5  motions, then I will make the referral and you will get

6  assigned to a magistrate judge.

7          But that's what I'm inclined to do.  Then we'll build

8  in all the other dates.  They all flow from the trial date

9  backwards.  I will build those in, pretrial conference,

10 dispositive motion, all of that.

11         **MR. PAPPAS:**  Right, your Honor.  That way after the

12 CMC in July 2012, then we would take up any issues of remaining

13 discovery and things like that.  All right?

14         **THE COURT:**  I know that's not what you're looking

15 for, Mr. Cooper, but I actually don't think it prejudices your

16 interests.  I mean, I understand your concern is that you want

17 certainty and you want to be able to get people organized and

18 all of that, but I think that would be accomplished by this

19 without its -- I recognize the delay is not the one you want,

20 but it is where we stand in this place at the moment.

21         Okay.  Anything else that we need to address today?

22         **MR. PAPPAS:**  Nothing from the defendants.

23         **MR. COOPER:**  No, your Honor.

24         **THE COURT:**  All right.  Thank you.  Thank you very

25 much.

1         (Whereupon, further proceedings in the

2          above matter were adjourned.)


4                         --oo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I, DEBRA L. PAS, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C 11 2525 RS, MEDIOSTREAM, INC. vs MICROSOFT CORP., et al were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

/s/ Debra L. Pas
_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Friday, September 16, 2011